UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KOLU STEVENS,
PATRICK GREENHOE, and
CLAUDETTE GREENHOE,

Plaintiffs,

v

MICHIGAN STATE COURT ADMINISTRATIVE OFFICE, MILTON L. MACK, JR., in his official capacity as Administrator of the Michigan State Court administrative Office, KIM B. MEAD, in his official capacity as Bay County Probate Court Administrator, WILLIAM M. HEFFERAN, in his official as Antrim County Circuit Court – Family Division Administrator,

Defendants.

No. 1:18-cv-00757

HON. PAUL L. MALONEY

MAG. JUDGE RAY KENT

**DEFENDANT MACK'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 1

STATE OF MICHIGAN

IN THE COURT OF APPEALS

IN THE MATTER OF
K. Stevens and,
C. Stevens, minors

File No. 339681

13th Circuit Court No. 16-7652-NA

_______________________________________________________________/

Antrim County Prosecutor
Attorney for Petitioner
P.O. Box 552
Bellaire, MI 49615
(231) 533-6860

J. Nicholas Bostic P40653
Attorney for Mother/Appellant
909 N. Washington Ave.
Lansing, MI 48906
(517) 706-0132

Anthony R. Wittbrodt II
Attorner for Minors
212 River St., P.O. Box 905
Elk Rapids, MI 49629
(231) 264-5650

_______________________________________________________________/

**RESPONDENT/APPELLANT MOTHER'S BRIEF ON APPEAL**

**ORAL ARGUMENT REQUESTED**

**CERTIFICATE OF SERVICE**

By: J. Nicholas Bostic P40653
Attorney for Appellant
909 N. Washington Ave.
Lansing, MI 48906
517-706-0132

RECEIVED by MCOA 12/5/2017 9:16:00 PM

**TABLE OF CONTENTS**

Table of Authorities ........ iii

Statement of Basis of Jurisdiction ........ v

Statement of Question Presented ........ vi

Statement of Facts ........ 1

Statement of Proceedings Below ........ 9

Argument ........ 14

I. DUE PROCESS CONSTITUTIONAL PROVISIONS PROTECT FUNDAMENTAL RIGHTS. EVIDENCE OF SUBSTANTIAL RISK OF MENTAL HARM MUST BE SUFFICIENT TO MEET THE STANDARD OF PREPONDERANCE OF THE EVIDENCE AND MAY NOT BE MERE CONJECTURE OR SPECULATION. WHERE THE PROSECUTION FAILED TO PRESENT EVIDENCE OF A SUBSTANTIAL RISK OF HARM TO THE MENTAL WELL-BEING OF THE CHILDREN CAUSED BY RESPONDENT MOTHER, DID THE TRIAL COURT ERR BY DENYING RESPONDENT MOTHER'S MOTION FOR JNOV OR NEW TRIAL? ........ 14

II. THE RIGHT TO BE INVOLVED IN THE UPBRINGING AND GUIDANCE OF CHILDREN IS A FUNDAMENTAL RIGHT PROTECTED BY THE DUE PROCESS CLAUSES OF THE FEDERAL AND STATE CONSTITUTIONS. WHERE A PROSECUTOR DELIBERATELY INTERJECTS HIGHLY UNFAIR AND PREJUDICIAL TESTIMONY INTO A PROCEEDING, DOES A TRIAL COURT ABUSE ITS DISCRETION IN FAILING TO GRANT A NEW TRIAL? ........ 20

Relief Requested ........ 23

Certificate of Service ........ 23



RECEIVED by MCOA 12/5/2017 9:16:00 PM

# TABLE OF AUTHORITIES

**Constitutional Provisions**

United States Constitution, Amend XIV ........ 19

Mich Const 1963, art 1, § 17........ 19

Const. 1963, art. 6, sec. 10........ v

**Supreme Court of the United States**

*Stanley v Illinois*, 405 US 645; 92 SCt 1208, 212; 31 LEd2d 551 (1972)........ 19

**Michigan Supreme Court**

*In re Sanders*, 495 Mich 394; 852 NW2d 524 (2014) ........ 19

*Kaminski v Grand Trunk W R Co*, 347 Mich 417; 79 NW2d 899 (1956) ........ 18

*Lowery v Enbridge Energy LP*, 500 Mich 1034; 898 NW2d 906 (2017)........ 17

*People v Babcock*, 469 Mich 247; 666 NW2d 231 (2003) ........ 15, 16

*People v Fields*, 448 Mich 58; 528 NW2d 176 (1995)........ 16

*People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002) ........ 20

*Skinner v Square D Co*, 445 Mich 153; 516 NW2d 475 (1994)........ 17, 18

*Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124; 666 NW2d 186 (2003) ........ 14

**Michigan Court of Appeals**

*Foreman v Foreman*, 266 Mich App 132; 701 NW2d 167 (2005)........ 14

*Heaton v Benton Const Co*, 286 Mich App 528; 780 NW2d 618 (2009)........ 14

*In re Trowbridge*, 155 Mich App 785; 401 NW2d 65 (1986) ........ 19

*Karbel v Comerica Bank*, 247 Mich App 90; 635 NW2d 69 (2001)........ 18

*People v Allen*, 201 Mich App 98; 505 NW2d 869 (1993) ........ 21

*People v Gonzalez*, 178 Mich App 526; 444 NW2d 228 (1989)........ 21



RECEIVED by MCOA 12/5/2017 9:16:00 PM

*People v McCartney*, 46 Mich App 691; 208 NW2d 547 (1973) ..... 21

*People v McCarver*, 87 Mich App 12; 273 NW2d 570 (1978) ..... 21

*People v Nicholson*, 297 Mich App 191; 822 NW2d 284 (2012) ..... 20

*People v Troncoso*, 187 Mich App 567; 468 NW2d 287 (1991) ..... 16

*People v Vansickle*, 303 Mich App 111; 842 NW2d 289 (2013) ..... 20

*Rental Props Owners Ass'n of Kent Co v Kent Co Treasurer*, 308 Mich App 498; 866 NW2d 817 (2014) ..... 15

*Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488; 668 NW2d 402 (2003) ..... 15

**<u>Statutes</u>**

MCL 600.308 ..... v

MCL 600.309 ..... v

MCL 712A.2 ..... 10, 12, 15

**<u>Court Rules</u>**

MCR 7.203 ..... v

**<u>Other</u>**

Random House Dictionary of the English Language: Unabridged Edition (1987) ..... 16

Webster's Third New International Dictionary, Unabridged Edition (1981) ..... 16



RECEIVED by MCOA 12/5/2017 9:16:00 PM

## STATEMENT OF JURISDICTION

This appeal is brought pursuant to MCR 7.203(A)(1)(a). The appeal is within the jurisdiction of the Court of Appeals pursuant to Const. 1963, art. 6, sec. 10, MCL 600.308(1), MCL 600.309. Order of adjudication was entered on June 27, 2017. ROA 82. Respondent Mother's motion for JNOV or new trial was denied within the order of disposition entered on July 25, 2017. ROA 99. Respondent Mother timely filed her claim of appeal on August 15, 2017.

RECEIVED by MCOA 12/5/2017 9:16:00 PM

**STATEMENT OF QUESTION PRESENTED**

I. DUE PROCESS CONSTITUTIONAL PROVISIONS PROTECT FUNDAMENTAL RIGHTS. EVIDENCE OF SUBSTANTIAL RISK OF MENTAL HARM MUST BE SUFFICIENT TO MEET THE STANDARD OF PREPONDERANCE OF THE EVIDENCE AND MAY NOT BE MERE CONJECTURE OR SPECULATION. WHERE THE PROSECUTION FAILED TO PRESENT EVIDENCE OF A SUBSTANTIAL RISK OF HARM TO THE MENTAL WELL-BEING OF THE CHILDREN CAUSED BY RESPONDENT MOTHER, DID THE TRIAL COURT ERR BY DENYING RESPONDENT MOTHER'S MOTION FOR JNOV OR NEW TRIAL?

Appellant Mother states YES.

Respondent Father has not appeared in this appeal.

Petitioner states NO.

The Guardian Ad Litem states NO.

The trial court stated NO.

II. THE RIGHT TO BE INVOLVED IN THE UPBRINGING AND GUIDANCE OF CHILDREN IS A FUNDAMENTAL RIGHT PROTECTED BY THE DUE PROCESS CLAUSES OF THE FEDERAL AND STATE CONSTITUTIONS. WHERE A PROSECUTOR DELIBERATELY INTERJECTS HIGHLY UNFAIR AND PREJUDICIAL TESTIMONY INTO A PROCEEDING, DOES A TRIAL COURT ABUSE ITS DISCRETION IN FAILING TO GRANT A NEW TRIAL?

Appellant Mother states YES.

Respondent Father has not appeared in this appeal.

Petitioner states NO.

The Guardian Ad Litem states NO.

The trial court stated NO.

RECEIVED by MCOA 12/5/2017 9:16:00 PM

## FACTS

*The Parties*

Respondent Mother/Appellant is the adoptive mother of K. Stevens and C. Stevens. She adopted them as a single parent. It is her understanding that the parental rights of the biological father were terminated. K. Stevens is a female and was 15 years old at the time of removal and is 16 years old at the time of this brief. C. Stevens is a male and was 16 years old at the time of removal and is 17 years old at the time of this brief.

*The petitioner's proofs*

The Petitioner presented the testimony of a limited license psychologist that had performed testing on the children and Respondent Mother in April 2014 as a result of a prior CPS referral. Jury Trial, Volume I, June 8, 2017, 66 (hereinafter T1). He assessed Respondent Mother, *Id*, 74. As far back as April 2014, Respondent Mother mention to Mr. Strauss the conflict with DeCamps about pushing C. Stevens into sports when she – as his mother – felt that his grades did not justify allowing him to play sports. *Id*, 95. The testing in 2014 was focused on Shamon (now an adult) because he was the problematic child at the time. Some of the testing instruments did not include or relate to C Stevens or K Stevens. *Id*, 99. As of 2014, Mr. Strauss diagnosed Respondent Mother with Obsessive Compulsive Personality Traits. *Id*, 101-102. He suggested further testing to rule out the possibility of Intermittent Explosive Disorder. *Id*, 102. He did not suggest individual therapy but said family therapy might make some progress. *Id*, 103. In 2014, he did not suggest a bonding assessment but indicated that DHHS informed him that Respondent Mother was to call him and set up a bonding assessment or parent/child observation. *Id*. It did not occur. *Id*, at 104.

Mr. Strauss testified extensively about his assessment of Respondent Mother. He identified issues concerning her potential aggressiveness, potential lack of insight, and her ability to open up with others. He did acknowledge that in 2014, C Stevens and K Stevens had positive views of

RECEIVED by MCOA 12/5/2017 9:16:00 PM

Respondent Mother, Trial I, 110-111. Mr. Strauss acknowledged that the objective test instruments have some ability to adapt to different cultures but only in a broad way. For example, one test allowed the assessor to select "Africa" but was not more specific. He indicated that subsets of cultural characteristics would be obtained through interviews. He then acknowledged very little experience assessing people from Liberia. *Id*, 112-113. He then acknowledged Respondent Mother's concern over the inner-city impact on the children in their very young ages. He agreed that there can be cultural differences even within the state. *Id*, 114. Mr. Strauss explained that the one incident of Respondent Mother grabbing K Stevens by the face while doing homework and both of them crying could be a sign of attachment from Respondent Mother to K Stevens. *Id*, 117.

Mr. Strauss was then asked about his assessment of K Stevens. His first assessment of her was in 2014. She reported the last spanking to be when she was approximately seven years old. *Id*, 120. His conclusions for K Stevens were Anxiety – not otherwise specified. He called it "floating" anxiety which did not meet the criteria for general anxiety. He ruled out physical abuse and post-traumatic stress. Id, 138. He did find inhibited/dependent personality traits. *Id*. On cross-examination, Mr. Strauss acknowledged that the period of reasonable reliance on an assessment such as the 2014 assessment was six to nine months for the mood issues. *Id*, 140. It is more inclined to change when a teenager is the subject of the assessment. *Id*, 141. Mr. Strauss acknowledged that any change in her expressions regarding her mother could be due to manipulation by persons other than Respondent Mother. *Id*, 142. Mr. Strauss also acknowledged that changes in her expressions about her mother (currently claiming fear) could be motivated by a desire to preserve her current environment. *Id*, 143.

RECEIVED by MCOA 12/5/2017 9:16:00 PM

Mr. Strauss was also called on the third day of trial to testify as to his two evaluations of C Stevens.[1] The first was in February 2014. The referral was for potentially excessive discipline. The second evaluation was in October 2016. The referral was again for physical abuse. T3, 6. Mr. Strauss acknowledged the drastic differences between the reports of C Stevens from 2014 to 2016. *Id*, 8. Mr. Strauss supplied two options for explaining the differences which was essentially that the issues are suppressed until there is a safe environment. *Id*, 10. Mr. Strauss was surprised that – based upon the reports from C Stevens – there were no objective signs of post-traumatic stress. *Id*, 11. He diagnosed C Stevens with oppositional defiant traits but the traits did not rise to a disorder. *Id*, 13. He also diagnosed C Stevens with narcissistic traits and anti-social personality traits. *Id*, 30.

On cross-examination regarding C Stevens, Mr. Strauss acknowledged a disconnect between the descriptions and the absence of evidence of PTSD. *Id*, 19. As an explanation, Mr. Strauss agreed that the absence of PTSD symptoms could mean that the claims of trauma were fabricated. *Id*, 20.

K. Stevens testified to being the adopted daughter of Kolu Stevens. Trial, June 9, 2017, 5 (T2). She acknowledged going into foster care on September 1, 2016, Id, 5-6. The first issue with her credibility occurred very quickly into her testimony. The prosecutor asked her if she had any reservations about going back to her mother's home and she said she did not. He then asked the question a different way and she said she did not want to go back. He then asked her if she knew what "reservations" meant and she said no. *Id*, 7. She testified to physical abuse such as throwing things, slapping the children and trying to choke them. She also testified to name-calling. She claimed that Ms. Stevens screams and gets hysterical. *Id*, 8. She claimed that she was locked in a

[1] On the first day of trial, Mr. Strauss testified via audio. He had a time limitation that caused his testimony to be finished on a different day. He testified live on the third day of trial and several other witnesses had testified in the interim.

RECEIVED by MCOA 12/5/2017 9:16:00 PM

basement for misbehaving. *Id*, 10. She testified that she would change her opinion from 2014 regarding her mother. She went as far as testifying that Ms. Stevens was bipolar. *Id*, 10-11.

On cross-examination, K. Stevens was asked about her August 2016 interview by the CPS worker. She admitted that she lied to the CPS worker when she claimed that the last time she was hit was "a long time." *I*d, 15-16. She did not report anything else to the CPS worker and claimed at trial that was also a lie. *Id*, 16. She admitted lying again to the CPS worker during her second August 2016 interview. *Id*. K. Stevens admitted that she initially did not tell the CPS worker about being locked in the basement or the hot peppers. She acknowledged that the additional allegations came after she was in foster care for a week. *Id*, 18. She did not recall when they lived in the house with the basement she claimed she was locked into. *Id*, 19. She did acknowledge that the house was owned by Mr. Hresko. *Id*, 26. She also admitted that she lied about issues between C Stevens and Ms. Stevens when she was interviewed by CPS. *Id*, 23. She admitted that in her last interview with the CPS worker she did mention some issues between C Stevens and Mrs. Stevens but claimed that she was told the information and not that she observed it. *Id*, 24.

C Stevens testified to his several instances of running away from home during August 2016. T2, 54-55. C Stevens also testified to physical, verbal, and mental abuse from Ms. Stevens. *Id*, 55. He testified that in 2008 while living in Detroit, Ms. Stevens assault his older brother with a hammer. This led to one year in foster care. *Id*, 56. He also claimed that she would hit them with broomsticks, throw things, and choke them. *Id*. He claimed that on one occasion a pan hit him in the hip and he could not walk for two days. *Id*, 57. He claimed that she stepped on his neck with her foot and choked him. *Id*, 58. He also claimed that he was locked in the basement of the Hresko home. *Id*, 58.

On cross-examination, C Stevens admitted that he lied to Mr. Strauss about not having any learning disabilities. He also lied about not having been in trouble at school. *Id*, 62. He

RECEIVED by MCOA 12/5/2017 9:16:00 PM

acknowledged running away three times the first week of August, and on August 21, and on August 25. *Id*, 64-65. C Stevens acknowledged that he did not tell the CPS worker about being locked in the basement when he was interviewed. *Id*, 70. C Stevens testified that in August 2016 he went to the Hresko home and told Paul Hresko that he had ran away. Mr. Hresko did not call the police or take him back home but helped C Stevens by trying to get him a job or find things to do. He did tell C Stevens to go back home. Id, 72. C Stevens acknowledged that the officer that found him during his first run-away was nice to him and they talked. He acknowledged that he did not tell the officer about the physical abuse. *Id*, 78. He acknowledged that the second time the officer found him he still did not tell him about the physical abuse. *Id*, 80. C Stevens acknowledged that during his first detention at Horton Bay he did not tell the staff that he was being physically abused. *Id*, 85.

C Stevens denied that there was an issue between him and his mother about him being home-schooled. *Id*, 81. Respondent's Exhibit 3 was a two-page handwritten letter acknowledged as authored by C Stevens. It was admitted as an Exhibit. *Id*, 113-114. C Stevens admitted that the letter he wrote said he did not want to be homeschooled. *Id*, 126.

While at another youth facility, the juvenile probation officer from the court came to visit him and told him that he would be going home. He acknowledged that he did not tell her then about the physical abuse. *Id*, 88. When he was dropped off form the Sault Tribe Youth facility on August 21, he claimed that Ms. Stevens told him he was not allowed to be home from 7:00 a.m. until 10:00 p.m. and he was to go get a job. He then left. *Id*, 90. On the night of August 25, 2016, he was caught out at night again by Officer Peterson of Elk Rapids and lied to the officer about having a job. *Id*, 94. C Stevens acknowledged that he was caught by Officer Peterson again on August 27, 2016 at which time the officer asked him why he was constantly running away. C Stevens acknowledged that he still did not report the physical abuse. *Id*, 96. C Stevens

RECEIVED by MCOA 12/5/2017 9:16:00 PM

acknowledged that he never told anyone other than his attorney prior to trial that his mother knocked him down and stepped on his throat. *Id*, 99.

Greydon Decamp had met the Stevens family at church in Elk Rapids and became friends. *Id*, 141. Mr. Decamp claimed that Ms. Stevens said she used locking the children in the basement as punishment. *Id*, 142. He also claimed that she said that she "got the children from the system and she would put them back in the system." *Id*, 143:4-7. He relayed an incident in 2012 where Ms. Stevens called him for assistance because she was being confronted by the police. He described her as yelling, screaming, and angry. He claimed that he tried to calm her but after she refused that he returned to his car and left. *Id*, 146. He returned and she did calm down and eventually went home. *Id*, 157. After a meeting with DHHS is 2013, Ms. Stevens informed the Decamp's that she did not want them involved with the children any longer. This occurred after Mr. Decamp tried to convince her to let C Stevens play sports. *Id*, 148-149.

Paul Hresko also testified that he met them as vice president of the foundation that sponsored their move to Elk Rapids from Detroit. *Id*, 159. Mr. Hresko claimed that on one day when C Stevens wen to his home that his wife fed him two meals. On the next day, C Stevens showed up and he talked to C Stevens. He claimed that he was informed of non-specific verbal and physical abuse. *Id*, 160. When asked if he observed the abuse, he did not answer but offered that Ms. Stevens had allegedly told him she locked the children in the basement. *Id*, 160-161. Mr. Hresko was asked about the building that he rented to the Stevens' in 2009. He did not know if the basement door had a lock but he thought it had a hook and eye. *Id*, 168.

The prosecutor called the CPS worker but her direct testimony essentially covered only procedure. On cross-examination, she testified that she became a CPS worker in May 2016. T3, 45. She denied working in the social work field prior to 2016. *Id*, 46. One of the first things she did after receiving the referral was speak to the reporting person, Teresa Ankney, the juvenile

RECEIVED by MCOA 12/5/2017 9:16:00 PM

probation officer for C Stevens. *Id*, 70. Ms. Stevens informed Ms. Frakes that the juvenile probation officer and referee had instructed her to not report C Stevens as a runaway. *Id*, 75. She took Ms. Stevens to Elk Rapids and reported C Stevens as a runaway. *Id*.

Ms. Frakes denied that the Forensic Interview Protocol recommended that child interviews be recorded or that notes be preserved. *Id*, 51. She did not record her interviews or retain her notes from the interviews of C Stevens or K Stevens. *Id*, 52.

Respondent Mother, Ms. Stevens, called the juvenile probation officer for C Stevens. She testified that she does not normally become involved with overseeing juveniles until after disposition. T3, 110. She described Horton Bay farms as a non-secure detention home. It is a dwelling specially licensed for temporary placements pursuant to court order. *Id*. In the C Stevens case, she was involved in a hearing that resulted in the placement of C Stevens at the Sault Tribe Youth Facility. She described her capacity as "case manager." *Id*, 111. She described it as a secure, locked facility. *Id*, 111-112. Ms. Ankney testified that the Juvenile Court Administrator and Referee ordered that C Stevens be released from the Sault Tribe Youth Facility two days after he was ordered there for two weeks because it was not an appropriate facility for a status offender. *Id*, 113-114. Respondent's Exhibit 10. The order for release was entered on the 18th of August and he was to be released on August 21. Id, 114.

She testified that there was also an order to provide in home services which included counseling services for both him and his mother. *Id*, 115. She had asked Ms. Stevens to go pick him up but she could not due to medical reasons. She visited C Stevens between the order to release and his return. He did not mention physical abuse to her. *I*d, 116-117. She was not present when he was returned home by the transport personnel on August 21, 2017. *Id*, 116. Ms. Stevens testified that Ms. Ankney never presented her with any paperwork prior to August 21 and that she called Ms. Ankney after C Stevens left after being dropped off. T3, 174-175. Ms. Stevens did not

RECEIVED by MCOA 12/5/2017 9:16:00 PM

know what day he would be arriving. *Id*, 175. Ms. Ankney admitted drafting a letter and power of attorney for Ms. Stevens to sign. She denied presenting it to her at Ms. Stevens' restaurant and claimed it was mailed. She did not recall if she spoke to Ms. Stevens' about it. *Id*, 119-120.

She admitted preparing the first DHHS form 3200, report of suspected abuse or neglect. Id, 124-125, Respondent's Exhibit 5. It only reported working excessive hours and did not mention physical abuse or being locked in the basement. He had not complained of those issues at the time to her. *Id*, 125. She then admitted that she had a conversation with Ms. Stevens at the restaurant on August 22 or 23, 2016. She claimed that during this conversation she learned that C Stevens was gone allegedly because Ms. Stevens told him to leave. *Id*, 126-127. Respondent's Exhibit 6. She again denied presenting the power of attorney at the restaurant and claimed she mailed it the following day. *Id*, 127.

Respondent Mother, Ms. Stevens, testified in her own behalf. She explained the relationship with the children and how she came to adopt them. She then explained the relationship with Pastor Mayers and her transition to Elk Rapids from Detroit. As she began to explain her awareness of Mr. Hresko and his adopted children, the prosecutor objected as to relevance when she mentioned that Mr. Hresko was fostering his cousins' children. The Court did not give Respondent Mother an opportunity to respond to the objection and ordered the last answer to be disregarded by the jury. *Id*, 135. During a break, this issue was raised by Ms. Stevens and she made an offer of proof as to why she wanted to testify about Mr. Hresko and his children. Id, 149. The trial court disagreed and the testimony as to his motive and bias was not allowed.

On the evening of August 21, 2016 after C Stevens left, Ms. Stevens went looking for him. She saw him walking to the beach from Mr. Hresko's house. *Id*, 175. On August 22, 2016, she learned from the police that C Stevens was not going to be placed in the system as a runaway on orders from the juvenile court. *Id*, 178. On the same day, Ms. Stevens received a phone call from

RECEIVED by MCOA 12/5/2017 9:16:00 PM

Ms. Ankney during which Ms. Ankney told her that C Stevens was under court jurisdiction and she should "stay the hell away from the police." *Id*, 179:5-9. On August 23, 2016, Ms. Ankney arrives at the restaurant and insists that Ms. Stevens sign the power of attorney and claimed that the judge wanted it. Ms. Stevens refused. Subsequently, the two women went looking for C Stevens but did not locate him. *Id*, 181-182. Ms. Ankney continued to tell her to stay away from the police. *Id*, 182.

The following morning, CPS worker Michelle Frakes shows up at the restaurant. After she explained why the police were not involved, Ms. Frakes and Ms. Stevens do report him as a runaway. *Id*, 183-184.

Regarding Mr. Decamp and the 2012 incident that he described, she explained that part of Mr. Decamp's difficulty in recalling details was due to Mr. Decamp being intoxicated. *Id*, 136. She also explained C Stevens' history with sports and how his school performance had improved when he did not participate. She explained that the Decamp's undermined this progress by their insistence that he play sports. *Id*, 138.

PROCEEDINGS BELOW

*C's delinquency proceedings of August 2016*

A petition had been filed concerning C's delinquency (run-away) and those documents are not of record in the instant file in the trial court. They are mentioned, however, in the trial proceedings. Rather than insert them into the factual section above, they are procedurally relevant to some of Ms. Stevens' arguments and will be placed in this procedural section.

After the third runaway event, C Stevens was jailed, went to court the following morning and then went to a youth facility at Horton Bay. T2, 84. The order of August 5 required a two week stay at Horton Bay. T3, 172. During a hearing on August 16, 2016, C Stevens told the judge or referee that if he was sent home he would run away again. Ms. Stevens testified that she did not

RECEIVED by MCOA 12/5/2017 9:16:00 PM

hear that but Ms. Ankney was aware of the statement by Christian that he would run away again if sent home. T3, 173. He was then sent to the Sault Tribe Youth Facility. T2, 87.

During a telephone call between Ms. Ankney and Ms. Stevens on August 18 or 19, Ms. Ankney told Ms. Stevens that C Stevens was being returned. Ms. Stevens told Ms. Ankney that the two-week order should be followed. T3, 173-174. He was returned home on August 21, 2016. After several more instances of running away and being caught, he was in court on August 28 and was being held until a hearing on September 1, 2016. It was during this period in jail that he was interviewed by the CPS worker, Michelle Frakes. *Id*, 96-97. On September 1, 2016, the delinquency case is dismissed and he was removed from the home pursuant to a hearing on the same day under the instant neglect and abuse petition. *Id*, 97. See also, T3, 77-78.

*The instant petition and pre-trial proceedings*

The petition was filed on September l, 2016. ROA 1.[2] A pickup order was requested and obtained on the same day. ROA 2. The petitioner was authorized and the children were placed with DHHS. Order, ROA 5. The original petition cited MCL 712A.2(b)(1) and (2) and contained an attachment with 10 narrative paragraphs. The preliminary hearing was continued until September 14, 2016. An amended petition was filed also on September 14, 2017. ROA 11. The amended petition cited the same two statutory provisions and contained an attachment with four new narrative paragraphs in addition to the original 10. These narrative paragraphs were based upon referrals from C Stevens' juvenile court officer's 3200 reports to DHHS.

A pretrial was held on September 28, 2016 at which time the matter was set for jury trial. ROA 19. A status conference was set for November 9, 2016. ROA 20. A jury trial was scheduled for December 1 and 2, 2016. ROA 22, 25. The prosecutor requested an adjournment of the trial

[2] There is a separate ROA for each child. All references will be to the ROA for C unless there is a difference relevant to the issues raised.



RECEIVED by MCOA 12/5/2017 9:16:00 PM

and it was rescheduled to December 19 and 20, 2016. ROA 28, 29. The Court then ordered the status conference moved to November 30, 2016. ROA 30. After the status conference, an order of adjournment continued the status conference to December 19, 2016 and adjourned the trial without date. ROA 35. On December 22, 2016, the trial was set for February 27, 2017 and the status conference was set for February 22, 2017. ROA 37, 38. On January 24, 2017, counsel was substituted for Respondent Mother. ROA 45. On February 22, 2017, the matter was sent for mediation. ROA 54. Alternative dispute resolution occurred on April 27, 2017 but did not result in resolution of matter. The agreement that was reached was for the management of services to be transferred to Bethany Christian Services from DHHS. ROA 56.

A conference was held on May 11, 2017 to implement the mediation agreement. ROA 66. An order was then entered setting the jury trial to begin on June 8, 2017. ROA 67. The jury trial commenced on June 8, 2017 and continued on June 9, 2017. ROA 83, 84. Day 3 of the jury trial occurred on June 22, 2017. ROA 85. Day 4 of the jury trial occurred on June 26, 2017. ROA 86. The final day of the jury trial was June 27, 2017. ROA 87.

Prior to the beginning of the trial, the trial court heard petitioner’s motion to admit a 2008 adjudication order from Wayne County concerning a neglect and abuse plea entered by Respondent Mother. The allegation was that she had used a belt on an older sibling of C Stevens and K Stevens. The trial court granted the motion over the objection of Respondent Mother. The objection was based on the age of the sibling at the time (approximately 8 years old) and the age of the children in the instant matter, 15 and 16 as well as the age of the adjudication itself (8 years). The trial court found that the evidence was admissible pursuant to MRE404(b) for the purpose of showing scheme, intent, plan, or system in discipling children and that the unfair prejudice did not outweigh the probative value. T1, pp. 3 – 11,

RECEIVED by MCOA 12/5/2017 9:16:00 PM

At the close of Petitioner's proofs, a motion was filed for a directed verdict by Respondent Mother. T3, 82. The petition had proceeded initially on five theories for jurisdiction as to each child:

1. MCL 712A.2(b)(1) - the parent when able to do so, neglected or refused to provide proper or necessary support, education, medical, surgical, or other care necessary for the child's health or morals (hereinafter failure to provide).

2. MCL 712A.2(b)(1) - the child is subjected to a substantial risk of harm to his or her mental well-being (hereinafter mental harm).

3. MCL 712A.2(b)(1) - the child has been abandoned by the parent (hereinafter abandonment).

4. MCL 712A.2(b)(1) – the child was without proper custody or guardianship (hereinafter without proper custody).[3]

5. MCL 712A.2(b)(2) - the child's home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of the parent, is an unfit place for the child to live in (hereinafter unfit home). See ROA 11, p. 2.

The oral motion for directed verdict initially focused on the failure to provide and abandonment theories. T3, pp. 83-85. The issue raised was lack of evidence. Respondent Mother also moved that the mental harm theory be stricken because of a lack of evidence of *substantial* mental harm. *Id*, 84. Respondent Mother challenged a portion of the unfit home allegation by claiming that the requirement for neglect, drunkenness, criminality or depravity failed due to lack of evidence. She also argued that the cruelty element failed due to lack of mental intent. *Id*, at 85.

---

[3] The Petitions actually used were a 2013 version and the language reciting this subsection actually combined abandonment and being without proper custody or guardianship. Based on the result of the trial, this drafting/instruction issue became moot.



RECEIVED by MCOA 12/5/2017 9:16:00 PM

The attorney for the minors argued that the phrase "other care" should remain in. Respondent Mother challenged that phrase on vagueness under due process grounds. *Id*, at 89. The motion was granted in part and denied in part. *Id*, 92. At the conclusion of the trial, the trial court instructed the jury on all five theories as to C Stevens and only four of the theories s to K. Stevens omitting the "without proper custody" theory. *Id*, 203-204. The exact language of each verdict form was read into the record during instructions and is at Attachment 1 to this brief. The words drunkenness, criminality, or depravity were left in for both children. T4, p. 70.

On June 27, 2017 (Day 5), the jury returned its verdict. As to each child, the jury found that the court had jurisdiction only on the allegation that the child was subject to a substantial risk to her or her mental well-being. T5, 6. The poll revealed it was five out of six jurors concurring. *Id*, 7. The order of adjudication entered on June 27, 2017. ROA 82. Respondent Mother filed a motion for judgment notwithstanding the verdict or for a new trial on July 19, 2017. ROA 93. A hearing was held on the motion on July 25, 2017 and the motion was denied. The order of disposition was entered also on July 25, 2017 and contained within in the order denying Respondent Mother's motion. ROA 99, p. 5, ¶25. Respondent Mother timely filed her claim of appeal with this Court on August 15, 2017.

RECEIVED by MCOA 12/5/2017 9:16:00 PM

## LAW/ARGUMENT

I. DUE PROCESS CONSTITUTIONAL PROVISIONS PROTECT FUNDAMENTAL RIGHTS. EVIDENCE OF SUBSTANTIAL RISK OF MENTAL HARM MUST BE SUFFICIENT TO MEET THE STANDARD OF PREPONDERANCE OF THE EVIDENCE AND MAY NOT BE MERE CONJECTURE OR SPECULATION. WHERE THE PROSECUTION FAILED TO PRESENT EVIDENCE OF A SUBSTANTIAL RISK OF HARM TO THE MENTAL WELL-BEING OF THE CHILDREN CAUSED BY RESPONDENT MOTHER, THE TRIAL COURT ERRED BY DENYING RESPONDENT MOTHER'S MOTION FOR JNOV OR NEW TRIAL.

A. Preservation of the issue and standard of review.

1. Preservation of the issue.

Respondent Mother included in her motion for directed verdict challenges to the element of "substantial" risk of mental harm. T3, 84. At the conclusion of instructions, Ms. Stevens concurred that the instructions as given were consistent with the trial court's ruling but preserved her earlier objection. T4, 72. Respondent Mother's Motion for JNOV or new trial (ROA 93) also raised the issue of whether the evidence was insufficient to show a substantial risk of harm to the mental-well being of the children thereby entitling her to a directed verdict. In the alternative, she argued that the failure of proofs at least warranted a new trial due to the

2. Standard of review.

The Court of Appeals reviews *de novo* a trial court's decision on a motion for JNOV. ***Sniecinski v Blue Cross & Blue Shield of Mich***, 469 Mich 124, 131; 666 NW2d 186 (2003). "[A] motion for JNOV should be granted only when there was insufficient evidence presented to create an issue of fact for the jury." ***Heaton v Benton Const Co***, 286 Mich App 528, 532; 780 NW2d 618 (2009). "When the evidence presented could lead reasonable jurors to disagree, the trial court may not substitute its judgment for that of the jury." ***Foreman v Foreman***, 266 Mich App 132, 136; 701 NW2d 167 (2005). The evidence is reviewed in a light most favorable to the non-moving party. ***Sniecinski v Blue Cross & Blue Shield of Michigan***, *supra*.

The court of appeals reviews a trial court's decision on a motion for a new trial for an



RECEIVED by MCOA 12/5/2017 9:16:00 PM

abuse of discretion**.** ***Wiley v Henry Ford Cottage Hosp***, 257 Mich App 488, 498; 668 NW2d 402 (2003). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. ***Rental Props Owners Ass'n of Kent Co v Kent Co Treasurer***, 308 Mich App 498, 531; 866 NW2d 817 (2014). When a party claims that the verdict is against the great weight of the evidence, the Court may not overturn the verdict unless the verdict is manifestly against the clear weight of the evidence. ***Wiley***, 257 Mich App at 498. "The jury's verdict should not be set aside if there is competent evidence to support it." *Id*.

B. Analysis of the sufficient of the evidence for substantial risk.

The word "substantial" and the phrase "substantial risk" are not defined in MCL 712A.1. The statutory provision at issue is MCL 712A.2(b)(1) which contains four bases but the basis at issue here - "[juvenile] is subject to a substantial risk of harm to his or her mental well-being" - is the only option within that does NOT include conduct on the part of the parent.[4]

The jury's determination is to be based on circumstances at the time the petition is filed which, in this case, was September 1, 2016. M Civ. JI 97.40. A comparative use of the word has been defined by the Michigan Supreme Court in the context of variations from the criminal sentencing guidelines. In ***People v Babcock***, 469 Mich 247; 666 NW2d 231 (2003), the Michigan Supreme Court said "This Court stated that "only those factors that are objective and verifiable may be used to judge whether substantial and compelling reasons exist...." *Id*. at 62, 528 NW2d 176. We further stated that "the reasons justifying departure should 'keenly' or 'irresistibly' grab our attention, and we should recognize them as being 'of considerable worth' in deciding the

[4] For example, the first basis says "whose parent . . . . when able to so, neglects or refuses to provide. The third basis says "who is abandoned by his or her parents . . . ". The fourth basis is "who is without proper custody or guardianship. To further complicate the argument, the petition does not track the language of MCL 712A.1(b)(1) at it existed in 2016. The form used is from 2013. The petition language does not include "without proper custody or guardianship."

RECEIVED by MCOA 12/5/2017 9:16:00 PM

length of a sentence." *Id*. at 67, 528 NW2d 176. Lastly, we stated, "the Legislature intended 'substantial and compelling reasons' to exist only in exceptional cases." *Id*. at 68, 528 NW2d 176 (citing ***People v Fields***, 448 Mich 58; 528 NW2d 176 (1995)).

The word substantial is used as a qualifier in various other contexts. These include "substantial compliance" in contract cases; "substantial rights" in the harmless error analysis of unpreserved error; or "substantial compliance" in the context of a court's compliance with the rules of a plea proceeding. Whether any of the available definitions are appropriately applied, the existence of the word "substantial" as a qualifier as "risk" cannot be ignored.

In ***People v Troncoso***, 187 Mich App 567, 573-574; 468 NW2d 287 (1991), the Court of Appeals looked to dictionaries for definitions of "substantial" in the context of "substantial and compelling" reasons for variations from sentencing guidelines. That Court said:

> The term "substantial" is defined in Webster's Third New International Dictionary, Unabridged Edition (1981) as
>
> not seeming or imaginary: not illusive ... being of moment: important, essential ... considerable in amount, value, or worth ... soundly based: carrying weight.
>
> Similarly, The Random House Dictionary of the English Language: Unabridged Edition (1987) defines "substantial" as
>
> of ample or considerable amount, quantity ... basic or essential; fundamental ... of real worth, value, or effect ... essential, material, or important.

Even though ***Troncoso*** was abrogated ***by People v Fields***, 448 Mich 58, 67; 528 NW2d 176 (1995), the Supreme Court also used the Webster's definition that the Court of Appeals used.[5]

In this case, the only evidence of the mental well-being of either child was the testimony of Mr. Timothy Strauss as to Christian. While he also testified as to an evaluation he did of Kimora

[5] ***Troncoso*** was in the context of substantial and compelling reasons for departing downward from a mandatory minimum in a controlled substance sentence.



RECEIVED by MCOA 12/5/2017 9:16:00 PM

in 2014, he also stated that the validity of a psychological assessment is as short as six to nine months for personality traits. T1, 140-141. Christian was assessed again in October 2016 after he had been in placement for 1.5 months and after he had been out of the home most of the month of August 2016 wither due to running away or being in court ordered placement during the delinquency proceedings. The last time he was in the presence of Respondent Mother overnight was August 22, 2016 when he came home but successfully snuck out.

There was no testimony that Mr. Strauss's two definitive findings were *caused by* Respondent Mother: Oppositional Defiant Traits and Mixed Personality Traits of Anti-Social and Nacrissistic Features. Mr. Strauss under "diagnosis" listed "rule out post traumatic stress disorder – delayed onset." Mr. Strauss testified that even though Christian verbalized behaviors of Respondent Mother toward him that were extreme, Christian did not actually satisfy the criteria for a PTSD diagnosis which was somewhat surprising. T3, 11. He did not recommend that there be no contact between Christian and Respondent Mother.

As to Kimora, there was simply insufficient evidence presented as to any current risk to her or actual harm. Respondent Mother acknowledges that the statutory basis is "risk" not actual harm. Nonetheless, actual harm would be a good indicator of whether there was any risk. Mr. Strauss did not do another evaluation of K Stevens in 2016 and his 2014 findings are too stale to meet the burden of preponderance of the evidence.

C. Inferences from the evidence.

The trial record invites speculation and conjecture as to whether the risk of harm is "substantial" but does nothing else to convince a rational juror that the required risk actually exists. A plaintiff may not rely on speculation or conjecture. ***Lowery v Enbridge Energy LP***, 500 Mich 1034; 898 NW2d 906 (2017), citing ***Skinner v Square D Co,*** 445 Mich 153, 164; 516 NW2d 475 (1994). While reasonable inferences are properly considered, the Michigan Supreme

RECEIVED by MCOA 12/5/2017 9:16:00 PM

Court has explained the difference between reasonable inferences and speculation and conjecture. . In ***Skinner v Square D Co***, *supra* at 164, the Court quoted ***Kaminski v Grand Trunk W R Co***, 347 Mich 417, 422; 79 NW2d 899 (1956):

> "[A] conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only. On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence." [Emphasis added]; see also *Karbel v Comerica Bank*, 247 Mich App 90, 98; 635 NW2d 69 (2001).

Mr. Strauss did not testify as to causation. Under the circumstances, any testimony he would give as to causation would have been irrelevant. He evaluated the family in 2014. The operative date in the instant case is September 1, 2016 when the petition was filed. This is not to say that the summer months of 2016 should be disregarded and causation is frozen as to September 1, 2016. But Mr. Strauss was very candid that the personality traits he identified were not to be considered valid after six to nine months – especially in teenagers. His 2016 evaluation of C Stevens was after the fact. Even if he could sort out the parental alienation that had occurred, he still never testified to causation. The Plaintiff may wish to cover this gap with an inference but it is too far of a stretch. In light of his candid comment that he was surprised no objective findings of PTSD were found based on the very specific claims of trauma, the Plaintiff simply cannot prevail on meeting the requirement of "substantial risk" through an inference from his testimony. As Skinner instructs, it is *evidence* that "must facilitate reasonable inferences of causation, not mere speculation." ***Skinner,*** *supra*, at 163–164.

In light of the jury's verdict, it is apparent that the allegations of the children were simply

RECEIVED by MCOA 12/5/2017 9:16:00 PM

not credible.[6] The difficulty in sorting this issue out is compounded by the highly unfairly prejudicial testimony of the treating counsel, Pamela Wolz, which is discussed next. Respondent Mother asserts that even if her testimony is not seen as unfairly prejudicial, Plaintiff failed to present any evidence of a substantial risk to mental harm and failed to establish actual mental harm caused by Respondent Mother.

Due to the failure of proofs, Respondent Mother is entitled to a judgment in her favor notwithstanding the jury's verdict.

D. Constitutional issues.

The Due Process Clauses of the Michigan and United States Constitutions apply to child protective proceedings. U.S. Const., Am. XIV; Const.1963, art. 1, § 17; ***In re Trowbridge***, 155 Mich App 785, 786; 401 NW2d 65 (1986). Michigan's child protection laws constrain the state from interfering in the parent's fundamental right to parent unless and until sufficient proof has been presented that the child's moral, emotional, mental, or physical welfare needs protection by the state. See ***In re Sanders***, 495 Mich 394, 409–410; 852 NW2d 524 (2014); see also ***Stanley v Illinois***, 405 US 645, 652; 92 SCt 1208; 31 LEd2d 551 (1972).

Respondent Mother asserts that these protections also constrain the scope of inferences that may be reached in a child protective proceeding. The burden of proof is well-established at preponderance of the evidence for adjudication and allowing inferences is equally well-established. The scope of permissible inferences, however, should not be the same where opposing

[6] One of many examples is the testimony of K Stevens at T2, p. 7. She answered a question without knowing the meaning of the operative word used in the question. Plaintiff asserts that is the result of two things. First, she gave the answer she thought the prosecutor wanted to hear which essentially taints everything she told the jury and the social worker. This is supported by the fact that she did not tell these things to Mr. Strauss during her assessment. Second, her "feelings" at the time of trial are the result of parental alienation engaged in deliberately by DHHS and inadvertently by the foster parents.



RECEIVED by MCOA 12/5/2017 9:16:00 PM

parties are fighting over land, money, or contracts as opposed to a context where a constitutionally protected, fundamental right is involved.

## II. THE RIGHT TO BE INVOLVED IN THE UPBRINGING AND GUIDANCE OF CHILDREN IS A FUNDAMENTAL RIGHT PROTECTED BY THE DUE PROCESS CLAUSES OF THE FEDERAL AND STATE CONSTITUTIONS. WHERE A PROSECUTOR DELIBERATELY INTERJECTS HIGHLY UNFAIR AND PREJUDICIAL TESTIMONY INTO A PROCEEDING, A TRIAL COURT ABUSES ITS DISCRETION IN FAILING TO GRANT A NEW TRIAL.

### A. Preservation of the issue and standard of review.

#### 1. Preservation of the issue.

Respondent Mother's objection during trial, T2, 135 was sustained due to a non-responsive answer as to what services she was provided. No testimony was stricken. The prosecutor moved on but then asked Ms. Wolz for her recommendations including whether reunification was appropriate. An objection was again sustained and the trial court gave a curative instruction. The unfair prejudice of the testimony and the improper questions which caused the need for objections in front of the jury were included in the motion for new trial. ROA

#### 2. Standard of review.

A trial court abuses its discretion "when its decision falls outside the range of principled outcomes." ***People v Nicholson***, 297 Mich App 191, 196; 822 N.2d 284 (2012). A finding of fact is "clearly erroneous if [the reviewing court is] left with a firm conviction that the trial court made a mistake." ***People v Vansickle***, 303 Mich App 111, 115; 842 NW2d 289 (2013). Questions of law are reviewed de novo. ***People v LeBlanc***, 465 Mich 575, 579; 640 NW2d 246 (2002).

### B. Ms. Wolz's testimony was unfairly prejudicial.

Respondent Mother's challenge is to Ms. Wolz's non-responsive testimony that was highly and unfairly prejudicial. The prosecutor asked he what services were being provided and she began her answer with "We are actually following an evidence based protocol, called Trauma

RECEIVED by MCOA 12/5/2017 9:16:00 PM

Focused Cognitive Behavior Therapy, which is State of Michigan approved as one of the best." T2, 135. Respondent Mother objected and the objection was sustained. The prosecutor continued and she explained some of the things the children were saying instead of explaining what she was providing. The prosecutor then began asking her for her opinion on matters such as reunification in front of the jury. The objection of Respondent Mother was sustained but the damage was done.

In criminal cases, prosecutors and police witnesses have a special obligation to not inject improper testimony even if non-responsive to a question. ***People v McCarver***, 87 Mich App 12; 273 NW2d 570 (1978); ***People v McCartney***, 46 Mich App 691; 208 NW2d 547 (1973). Respondent Mother asserts that the same due process considerations that apply regarding criminal cases should apply to child protective proceedings when government actors deliberately interject irrelevant and unfairly prejudicial matter into a trial.

In summary, Ms. Wolz's testimony was unfairly prejudicial on many fronts because it addressed a time span completely unrelated to the events in the petition. Her provision of services spanned well in to 2017 and she had only known the children while they were in foster care. She had not counseled or met Respondent Mother and was in no position to give an opinion – expert or otherwise – as to whether Respondent Mother was creating a substantial risk to the children either at the time of the petition or afterwards.

C. A curative instruction would not have sufficed to address the unfair prejudice.

Absent an objection or a request for a curative instruction, an appellate court will not review alleged prosecutorial misconduct unless the misconduct is sufficiently egregious that no curative instruction would counteract the prejudice to defendant or unless manifest injustice would result from failure to review the alleged misconduct. ***People v Allen***, 201 Mich App 98; 505 NW2d 869 (1993); ***People v Gonzalez***, 178 Mich App 526; 444 NW2d 228 (1989). In this case, there was an objection. The trial court gave a curative instruction, T2, 139, but it addressed only

RECEIVED by MCOA 12/5/2017 9:16:00 PM

the improper questions concerning Ms. Wolz' opinion as to disposition or reunification.

Respondent Mother asserts that her testimony was incurable for the following reasons:

- her testimony as to the children's claims of physical abuse were the fourth iteration of those claims. The first was through Mr. Strauss' testimony concerning his 2016 evaluation of C Stevens, The second and third were the versions from the minor children.

- the questions put to her were not directed at laying the foundation for her opinion as to a diagnosis and were solely directed at her giving an opinion as to reunification which was entirely irrelevant.

- her non-responsive testimony at T2, p. 135 of "evidence based protocol" suggested a body of evidence that was directing her choice of therapy. This was compounded by her explanation of the number of sessions recommended based on single event or "complex trauma," once again suggesting that some source outside the trial had reached these conclusions. Id, 137. This testimony was completely irrelevant to the issue before the jury.

Respondent Mother asserts that the context in which the questions were asked is indicative of a deliberate injunction into the trial of unfairly prejudicial testimony. When combined with the disallowance of the bias of Mr. Hresko and the jury's ultimate determination of only one ground per child related to risk to mental well-being, it is an easy conclusion that this was not harmless error.

RECEIVED by MCOA 12/5/2017 9:16:00 PM

RELIEF REQUESTED

WHEREFORE, Respondent Mother respectfully requests this Honorable Court vacate the order of disposition and order of adjudication in this case and find that the evidence was insufficient to sustain the jury's verdict. Accordingly, the matter should be remanded with instructions to dismiss the petition based on the failure of proofs or, in the alternative, grant a new trial.

12/5/2017
Date

*/s/ J. Nicholas Bostic*
J. Nicholas Bostic P40653
Attorney for Respondent Mother

**CERTIFICATE OF SERVICE**

J. Nicholas Bostic certifies and says that on the 5th day of December, 2017, he served a copy of Brief on Appeal on all counsel of record by using the Court's electronic filing system which will send notice to all counsel of record. I declare that the above statement is true to the best of my information, knowledge and belief.

12/05/2017

*/s/ J. Nicholas Bostic*
J. Nicholas Bostic P40653
Attorney for Respondent Mother

RECEIVED by MCOA 12/5/2017 9:16:00 PM